NATIONAL WESTMINSTER BANK USA, Plaintiff,

v.

**Walter L. ROSS, Defendant.**

**No. 86 CIV. 6277 (SWK).**

United States District Court, S.D. New York.

Nov. 25, 1987.

Cole & Deitz, Edward H. Meyer, William M. Goldman, Joseph A. Di Benedetto, Sharon E. Jaffe, New York City, for plaintiff.

Wilentz, Goldman & Spitzer, Woodbridge, N.J., by Helen Davis Chaitman, Murray Cutler, Co-counsel, Brooklyn, N.Y., for defendant.

KRAM, District Judge.

Presently before the Court are plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and motion to dismiss defendant's answer and counterclaims contained therein.

This is a breach of contract action. Jurisdiction is invoked pursuant to 28 U.S.C. § 1332. On August 5, 1983, plaintiff National Westminster Bank USA ("NatWest") entered into a series of agreements with RPC Corporation ("RPC") pursuant to which NatWest agreed to lend up to $4,000,000 to RPC secured by liens on all of its assets. This agreement was based on a formula of 85% of receivables and 50% of inventory. In addition, NatWest agreed to loan to RPC $600,000 under an unsecured overdraft facility. As a condition of the financing, RPC was required to maintain its accounts at the bank. Defendant Walter Ross ("Ross"), the President of RPC, executed a guarantee of payment of RPC's obligations.

On May 17, 1986, the Internal Revenue Service filed a lien for unpaid taxes against RPC. Plaintiff contends, and defendant does not contest, that this act constitutes a default by RPC under each of the loan agreements. At the time of the default RPC's outstanding obligation to NatWest was $2,076,064.

On June 5, 1986, Roy Grossman, a Vice-President of RPC, met with Ross and personally handed him a notice of default. Later that day Ross contacted Grossman to inform him that RPC's Board of Directors had decided to surrender peaceful possession of RPC's assets to NatWest. RPC executed the surrender by letter, signed by Ross in his capacity as President of RPC and guarantor, in which Ross acknowl-

edged the existence of a default by RPC. NatWest then scheduled a sale of the collateral for July 30 and 31, 1986.

In the interim, an involuntary Chapter 7 proceeding was filed against RPC which, under the Bankruptcy Code, prevented NatWest from proceeding with the auction sale. NatWest moved before the Bankruptcy Court seeking permission to conduct the auction sale, Ross consented on the record to NatWest's motion, and RPC's assets were then sold and the net proceeds turned over to NatWest.

This action is brought by NatWest to recover the balance due on the loan, which it alleges now amounts to $1,584,520. NatWest argues that the loan agreements are enforceable against Ross, that it properly demanded payment from RPC and Ross after the lien was filed because the lien constituted default, and that Ross waived his right to interpose any defense or counterclaim in this action.

Ross claims that he is not liable on the loans because of a series of deceitful acts allegedly perpetrated on RPC by NatWest between the time the loan agreements were signed and the default, designed to ensure that RPC would default on its loans. Ross contends that in March 1984, in response to RPC's request that its reduction payments to the bank on the overdraft facility be reduced from $50,000 to $25,000 per month, NatWest agreed to the reduction provided that RPC arrange elsewhere for $300,000 in additional financing which would be subordinate to NatWest. Ross asserts that the NatWest officers recommended that RPC obtain the subordinate financing from M.J. Williams Company of New York ("Williams"). Ross contends that later in 1984 Williams was put into a liquidation proceeding "amidst allegations of credit fraud, money laundering and misuse of funds". (Ross Aff. Para. 9).

Ross claims further that in February of 1985 Grossman advised him that NatWest had recently changed its general loan policy by redefining it target loan market to companies headquartered in or within 150 miles of New York, and that because RPC was located in North Carolina, NatWest wanted it to find another lender. He contends that Grossman stated that if RPC did not move in a reasonable time, the Bank would "'get rough'". (Ross Aff. Para. 12). Grossman then allegedly informed Ross that the Bank was going to reduce by 25,000 a month the advance rate on inventory financing provided for in the August 5, 1983 loan agreement.

In November 1985, Ross, after allegedly having been unable to secure alternative financing for the company [1], spoke again with NatWest officials about the financial condition of the company. In December 1985, the Bank officials allegedly agreed to extend the RPC credit facility for one year if RPC paid an additional $30,000 credit facility fee and added an additional $100,000 to the company as subordinate capital. Ross claims that he then contributed $100,000 of his personal funds to the company, and permitted NatWest to withdraw the $30,000 fee from RPC's account.

Ross claims further that unbeknownst to him, beginning in October 1985, NatWest had established a freeze on RPC's accounts effective on or about the tenth of every month to ensure that there would be enough left in the account on the 30th day of the month to pay the bank whatever was due that day. Ross contends that under this arrangement NatWest dishonored a total of 123 RPC checks between October 1985 and May 1986. According to Ross, among the dishonored checks were vendor and payroll checks, which created turmoil for RPC's suppliers and employees and on two occasions resulted in the arrest, on felony charges, of RPC's comptroller. (Complaint Para. 19).

Ross claims that on May 1, 1986, in response to his request for a nine month moratorium on all credit withdrawal and interest and principal payments while RPC developed a workout plan, he was informed by NatWest officers that the Bank had agreed to a six-month moratorium on inventory credit withdrawals. Ross contends

---

1. Ross contends that he was unable to secure alternative financing because the Banks cutbacks made it virtually impossible to keep the company going on a sufficiently viable basis to attract a new lender. (Ross Aff. Para. 14).

that the NatWest officials promised to send him a confirming letter and assured him that the Bank would not take $25,000 a month from RPC's account in April and May, 1986. Ross claims that in reliance on that agreement he sent letters to RPC's creditors, approved by a NatWest officer, asking them to accept an extended payout.

On May 5, 1986, RPC sent a check in the amount of $82,711 to NatWest. Ross contends that between May 5 and June 5, 1986 he repeatedly contacted the Bank in an unsuccessful effort to ascertain whether the check had cleared. Ross contends that because he was unable to ascertain whether the funds were available, he was forced to loan RPC an additional $50,000 in the month of May 1986. Ross contends that Bank records now reveal that the check had cleared on May 7, 1986, and that the Bank did not inform him until June 5, 1986 that the check was good and that NatWest had applied the money to a loan payment due on that day.

Based on these alleged facts Ross asserts the following counterclaims against NatWest: breach of contract (Count One); usurpation of Ross's powers as President of RPC (Count Two); breach of fiduciary duty (Count Three); breach of duty to deal in good faith (Count Four); fraudulent inducement (Count Five); loss of employment (Count Six); breach of contract (to pay Ross unpaid salary and expenses) (Count Seven); intentional infliction of economic and emotional harm (Count Eight).

### SUMMARY JUDGMENT

Plaintiff seeks summary judgment on its single claim for the principal sum of $1,584,520 plus interest and attorney's fees.

■ Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). The Court's role is to determine whether there are issues to be tried. *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). The

movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Heyman, supra,* 524 F.2d at 1320. The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmoving party has the burden of coming forward with "specific facts showing that there is a genuine issue for trial". Fed.R.Civ.P. 56(e). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts". *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.

Plaintiff seeks summary judgment on its single claim for the principal sum of $1,584,520 plus interest and attorney's fees.

■ The relationship between a guarantor and a lender is contractual in nature and defined by the contract of guarantee. *Bank of North America v. Shapiro,* 31 A.D.2d 465, 298 N.Y.S.2d 399 (1st Dep't 1969). It is clear, and defendant does not contest that he signed a series of agreements with NatWest under which he is liable for the full amount of the loan balance in the event of default. Moreover plaintiff asserts, and defendant does not contest, that the filing of the tax lien against RPC constituted default under each of the loan agreements.

■ Defendant responds, however, that summary judgment should not be granted to plaintiff on its claim because plaintiff materially altered the terms of the contracts between them so as to discharge him of liability on the contracts. "Any alteration in [a] loan made without the consent of

the guarantor, whether or not material, operates as a discharge." *Depositors Trust Co. v. Hudson General Corp.*, 485 F.Supp. 1355, 1362 (E.D.N.Y.1980); *U.S. v. Rollinson*, 629 F.Supp. 581 (D.D.C.1986); *But see, Worthen Bank & Trust Co., N.A. v. Utley*, 748 F.2d 1269 (8th Cir.1984) (only material alteration without consent operates as discharge of guarantor).

Defendant contends that the bank altered the loan agreement without his consent in the following ways: by unilaterally reducing by $25,000 the advance rate on the inventory financing to which RPC was entitled under the August 5, 1983 loan agreement and by establishing a freeze on RPC's account by the tenth of every month to assure that there would be money left in the account on the 30th day of the month. It is unclear whether defendant contends that he did not consent to the first alleged alteration, however it is clear that defendant contends that he did not consent to the second alteration.[2]

Defendant has put forth factual allegations which go to the heart of plaintiff's ability to recover under the guarantee agreement.[3] Based on these allegations, plaintiff's motion for summary judgment is denied.

## DISMISSAL

Plaintiff moves to dismiss defendant's counterclaims on the basis that the oral promises allegedly made by plaintiff to defendant are not binding, and alternatively, on the basis that defendant waived his right to assert counterclaims in this case. Plaintiff also moves to dismiss Counts Three, Four and Eight of defendant's counterclaims on the basis that the Bank did not breach its obligation of good faith to RPC.[4]

### Oral Promises

Defendant alleges that based on oral promises made by the bank to RPC the bank is now liable to RPC for breach of contract. Plaintiff contends that even if the oral promises were made they are not binding under the statute of frauds. Defendant contends that the oral agreements are binding under the doctrine of equitable estoppel.

The Accounts Receivable Loan Agreement between the parties provides that "[n]o modification or waiver of any provision of this Agreement, shall be effective unless in writing, signed by the parties hereto, and if so given shall apply only to the specific instances for which given." The Inventory Loan Agreement between the parties states that "[t]his agreement may not be modified except by a writing signed by the parties hereto."

Section 15–301 of New York's General Obligations Law provides "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such an executory agreement is in writing and signed by the party against whom en-

---

**2.** With regard to the first alleged alteration, Ross states that Grossman stated that "in order to give RPC the incentive to find other financing, the Bank was going to unilaterally reduce by $25,000 per month the advance rate on inventory financing to which RPC was entitled under the August 5, 1983 loan agreement". (Ross Aff. Para. 12). With regard to the second allegation, Ross states that "[a]pparently in October 1985, without any disclosure to RPC or me, Markowitz had established a freeze on RPC's accounts by about the tenth of every month to assure that there would be enough money left on the 30th of the month to pay whatever was due the Bank on that day".

**3.** As this Court noted above, speculation and conclusory allegations are not sufficient to defeat a motion for summary judgment. Citing *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9 (2d Cir.1986) and *National Bank or North America v. Quest*, 425 F.Supp. 186 (E.D.N.Y.1977) plaintiff contends that defendant has not demonstrated that his claims are something more than speculation, conjecture or hyperbole. This Court disagrees. Unlike the non-moving parties in those cases, Ross has submitted a sworn affidavit alleging specific occurrences in support of his allegations. This Court finds that a detailed factual affidavit constitutes more than mere "speculation", and in this case defeats a motion for summary judgment.

**4.** NatWest apparently also seeks to dismiss defendant's affirmative defense that the sale of RPC assets was not commercially reasonable. The Court will not entertain a motion to dismiss a defense at this juncture.

focement of the change is sought or by his agent."

The New York State Court of Appeals has held, however, that "when the oral agreement to modify has in fact been acted upon to completion, the same need to protect the integrity of the written agreement from false claims of modification does not arise. In such case, not only may past oral discussions be relied upon to test the alleged modification, but the actions taken may demonstrate, objectively, the nature and extent of the modification ... Thus, Section 15–301 nullifies only 'executory' oral modification. Once executed, the oral modification may be proved." *Rose v. Spa Realty Association*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279, 1283 (1977). The Court continued, "Where there is partial performance of the oral modification sought to be enforced, the likelihood that false claims would go undetected is similarly diminished. Here, too, the court may consider not only past oral exchanges, but also the conduct of the parties. But only if the partial performance be unequivocally referable to the oral modification is the requirement of a writing under section 15–301 avoided". *Id.* (citations omitted).

Finally, the Court stated, "Analytically distinct from the doctrine of partial performance, there is the principle of equitable estoppel. Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification. Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written". *Id.* 397 N.Y.S.2d at 927, 366 N.E.2d at 1283.

In this case defendant asserts that he relied on the Bank's assurances of continued financing, and that based on these assurances, he put more of his own personal money into RPC to keep it viable. Ross contends that if he had realized the Bank's "true" intentions in November 1985 he would have found a purchaser for the Bank

as a going concern and thereby raise sufficient funds to pay the Bank off in full. Ross's alleged reliance is fully articulated in his counterclaim pleading. In order to meet the *Rose* estoppel exception, however, defendant must establish that the conduct he relied on was not otherwise compatible with the agreement as written.

In *Rose* the Court found that where a written agreement for the conveyance of land for 150 units nowhere provided for its conveyance for 96 units, and the land was subsequently conveyed for 96 units pursuant to oral agreement, partial performance was unequivocally referable to the modification, not compatible with any option in the agreement, and therefore worthy of effect notwithstanding the statute of frauds. *Rose, supra,* at 928, 366 N.E.2d at 1284.

In this case the oral modifications allegedly relied upon by defendant—specifically, the promises of increased financing—were not provided for in any of the written agreements originally signed by the parties, and therefore under *Rose* are not compatible with those agreements. Plaintiff's alleged reliance on them to his detriment, if true, would give them effect. Plaintiff's motion to dismiss defendant's counterclaims because the oral modifications are not binding is thus denied.

*Waiver of Right to Assert Counterclaims*

■ Plaintiff claims that even if Ross's counterclaims are legally sufficient, defendant has waived his right to assert them in this action under the guaranty he signed, which provides that "[t]he Guarantor waives the right to interpose counterclaims or setoffs of any kind and description in any litigation arising hereunder". Defendant asserts that this waiver is not enforceable against him because the Bank is a fraudulent lender.

Under New York law, "[w]hile it is not violative of public policy to enforce waiver of the right to interpose counterclaims, nonetheless defenses based upon allegations of fraud may not be waived. This is because a written waiver in any form cannot operate to shield a party from his own fraud. For the courts to give effect to

such a clause would be violative of both public policy and morality, since an ultimate finding of fraud must of necessity vitiate the contract relied upon". *Sterling National Bank & Trust Company of New York v. Giannetti*, 53 A.D.2d 533, 384 N.Y. S.2d 176, 177 (1st Dep't 1976).[5]

In this case, defendant alleges fraud, which supersedes his waiver of the right to assert counterclaims. Plaintiff's motion to dismiss defendant's counterclaims on the basis of this waiver is thus denied.

*Obligation of Good Faith*

 In Counterclaims Three, Four and Eight defendant asserts that plaintiff is liable for breach of its duty to deal in good faith with him.

The parties do not dispute the existence of an implied obligation of good faith prescribed in Section 1–203 of the Uniform Commercial Code ("UCC"), or that this obligation cannot be disclaimed as under Section 1–102(3) of the UCC. Defendant contends that plaintiff breached its good faith duty when it unilaterally altered the terms of RPC's loan agreement by reducing by $25,000 a month RPC's loan availability on inventory. Plaintiff contends that it never breached its obligation to act in good faith because it at all times acted consistently with the terms of the loan agreements.

Plaintiff, citing *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) ("no obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship"), states that it acted in good faith and consistently with the contractual agreements when it called the loan after the tax lien was filed, which constituted an event of default. Defendant, however, does not contend that this was the exclusive breach of good faith.

Defendant contends that plaintiff breached its duty of good faith when it reduced the payouts by $25,000 without adequate notice to RPC to secure alternative financing. Maintaining the higher level of payout surely would not have been inconsistent with the terms of the loan agreement.

Plaintiff's motion to dismiss defendant's counterclaims based on breach of good faith duty is thus denied.

SO ORDERED.

---

**5.** Plaintiff's reliance on the New York Court of Appeals decision in *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) is simply misplaced. In that case the Court held that "[f]raud in the inducement of a guarantee by corporate officers of the corporation's indebtedness is not a defense to an action on the guarantee when the guarantee recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense available to a guarantor in respect of the guarantee, those recitals being inconsistent with the guarantors' claim of reliance upon an oral representation that the lending banks were committed to extend to the corporation an additional line of credit". *Id.* In this case, the alleged fraud perpetrated by the bank occurred after Ross' execution of the guarantee, and not in the inducement of the guarantee.