Alfredo RIVERA, Plaintiff,

v.

APPLE INDUSTRIAL CORP., and Effective Security Systems, Inc., Defendants.

No. 98 CV 3308(CBA).

United States District Court, E.D. New York.

March 30, 2001.

**206**

Alfredo Rivera, Brooklyn, NY, Pro se.

Paul Aronson, The City of New York, Law Department, Donald S. Krueger,

Ross & Hardies, New York, NY, for Apple Industrial Corp., Effective Security Systems, Inc., defendants.

## MEMORANDUM AND ORDER

AMON, District Judge.

Plaintiff Alfredo Rivera, a security guard formerly employed by defendants Apple Industrial Corporation ("Apple") and Effective Security Systems, Inc. ("Effective"), brought this action alleging violations of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Specifically, plaintiff alleges that defendants discriminated against, and subsequently discharged, him because he has diabetes and poor eyesight. Before the Court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Although plaintiff certainly appears to have been subjected to crude and distasteful remarks from certain of his supervisors, he fails to establish a violation of the ADA. For the reasons set forth below, the Court therefore grants defendants' motion.

### Background

The following facts, which are undisputed except where noted, are taken from plaintiff's complaint, plaintiff's and defendants' Rule 56.1 Statements, and relevant affidavits, exhibits, and deposition testimony.[1]

*The Parties*

Apple is a wholly-owned subsidiary of the New York City Economic Development Corporation ("EDC"), a not-for-prof-

---

1. On June 10, 1999, U.S. Magistrate Judge John L. Caden provided plaintiff with the proper notice required by *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615 (2d Cir.1999). The Court will disregard the various affidavits submitted by plaintiff after the instant motion was fully briefed. Notwithstanding the fact that such papers were submitted late, the additional materials either duplicate affidavits attached to plaintiff's complaint, or consist solely of inadmissible hearsay. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999) (inadmissible hearsay is not competent material for a Rule 56 affidavit) (citing *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991)).

it corporation that leases and oversees the development of properties owned by the City. Apple manages the industrial properties leased by EDC, including, the Brooklyn Army Terminal ("BAT"), a former United States naval base that is now a multi-tenant industrial facility.

Effective, a New York corporation, has provided security guard services at the BAT since 1995.

Rivera worked as a security guard for Apple from October 1992 until February 1995, and then was employed by Effective from February 1995 until April 18, 1996.

Rivera, who is 47 years old, has diabetes. He is blind in his left eye, but can see out of his right eye. During the time he was employed as a security guard, Rivera began to lose some vision in his right eye. He could, nevertheless, by his own account see well enough to perform his job.

*Rivera's Employment With Apple and Effective*

Rivera applied to work as a security guard for Apple in October 1992. He had been recommended for the job by a former co-worker of his, Carlito Bosques. Rivera had met Bosques in the 1980s because of their mutual interest in citizens band ("CB") radios, and Bosques had given Rivera a reference for a job with New York Rail Car, where the two worked together for several years. Bosques left New York Rail Car to work for Apple.

On his application for employment with Apple, Rivera noted that he had diabetes, and during his interview with Ismael Rios, Apple's Chief of Security at the BAT, Rivera again mentioned that he was diabetic and required insulin, and that he could not see out of his left eye. Rios, who hired Rivera after the interview, himself has diabetes and poor vision resulting from his diabetes.

Rivera never indicated to Apple that he desired or needed to work any particular schedule because of his diabetes. After he was hired, Rivera was assigned to the 12 a.m. to 8 a.m. shift for approximately six months, and then worked the 4 p.m. to 12 a.m. shift.

In February 1995, Effective entered into a contract with Apple to take over the provision of security services at the BAT. Effective interviewed all of the guards employed by Apple, and retained some of them, including Rivera. Both Rios and Carmen Giordano, the manager of the BAT for Apple, recommended to Effective that Rivera be retained.

Rivera did not note any limitations on his ability to perform any tasks or to work certain shifts in his application for employment with Effective, although he did inform Effective in his interview that he had diabetes.

For some period of time after he was hired by Effective, Rivera was not yet receiving medical benefits. On July 27, 1995, Rios faxed a letter to Effective asking that Effective expedite Rivera's request for medical benefits because Rivera was diabetic and low on insulin. During the time before he began receiving medical benefits from Effective, Giordano, who is also diabetic, provided Rivera with syringes and insulin.

*Rivera's Disciplinary Record*

While employed at Apple and Effective, Rivera was written up several times by his supervisors for unsatisfactory behavior.

On February 13, 1993, Bosques, one of Rivera's supervisors at Apple, caught Rivera watching television while on duty. Bosques prepared a report recounting the incident and stating that he had previously

warned Rivera twice not to watch television.[2]

On March 30, 1994, another supervisor, Charles Henriquez, wrote up Rivera after Rivera failed to report that he had physically restrained two children who had wandered onto the BAT with a group of other children. Rivera initially held onto one boy, who was able to slip away. Rivera then grabbed another child, an eight- to ten-year-old boy, who hit Rivera in his eye. Although Rivera reported the presence of the children over the radio, he did not mention until later that he had any physical contact with the boys, who were escorted off the property by two other security guards.

In June 1994, Rivera was suspended by Rios for five days after an incident involving another security officer, Rosa Ramos. Rivera and Ramos were apparently fighting while on duty.[3] Rivera did not protest his suspension. He was warned that he would be terminated if there was another incident between Ramos and Rivera.

On October 2, 1995, Bosques, now Rivera's supervisor at Effective, reported that Rivera had failed to lock the doors to the loading dock as instructed, and that Rivera had later been found in the basement of the BAT and had refused to say what he was doing in the basement. Rivera disputes this incident report, contending instead that he had closed the bay doors and made sure that they were secure, and that he was in the basement because that was the only way for him to return to the main lobby of the building.

On December 26, 1995, Bosques wrote another incident report on Rivera, stating that Rivera had called from his post at 11:26 p.m. asking to be relieved at 11:50 p.m., and that Rivera had threatened to leave at midnight if he was not relieved. Rivera claims that he does not recall such event.

The next day, December 27, 1995, Rivera was found asleep at his post. Bosques gave Rivera a written warning and recommended that Rivera be reassigned to another shift. Four days later, Rivera was reassigned to a rotating shift, the so-called "jump tour." His new hours were Mondays and Tuesdays from 12 a.m. to 8 a.m., Thursdays from 4 p.m. until 12 a.m., and Saturdays and Sundays from 8 a.m. to 4 p.m.

Rivera's new supervisor on the jump tour was Edward Colon. Rivera did not complain to Colon about being placed on the jump tour or tell Colon that the new hours might interfere with his ability to properly administer his diabetes medication.

While he was employed by Apple and Effective, Rivera generally had no problems with his supervisors. A number of them helped Rivera out from time to time by providing him with food, including Henriquez and Colon. Rios and Bosques would also occasionally buy Rivera snacks.

*Rivera's Departure From Effective*

The parties offer very different versions of how Rivera came to leave Effective in April 1996.

According to the defendants, on April 18, 1996, Rios found Rivera in the main lobby of the BAT eating and drinking coffee at the beginning of his shift, which was

---

**2.** Rivera contends that he was not aware of the policy prohibiting security guards from watching television at the time of the incident.

**3.** Although Rivera now contends that there was no verbal or physical altercation between Ramos and him, he concedes that Ramos did shove him and that other security officers had to order Ramos to put down a pipe she was wielding.

the 4 p.m. to 12 a.m. shift that day. Rivera and Rios then allegedly got into an angry confrontation, and Rios asked Bosques to take Rivera back to his post. When they arrived at the post, Bosques told Rivera that he needed to change his attitude and Rivera purportedly responded, "I don't care." Bosques reported Rivera's comments to Rios, who wrote a letter to Lucy Ortiz, Effective's Vice President, recommending that Rivera be transferred from the BAT. Rios then instructed Rivera to meet with Todd Lewis, Effective's dispatcher the next day.

Rivera's account of April 18, 1996 differs markedly. Rivera contends that Bosques called him at home that afternoon and said that he would pick him up at 3:15 p.m. so they could drive to work together. After Bosques failed to show up, Rivera walked to work, where he saw Bosques. Bosques then allegedly refused to give Rivera the security logbook and the two-way radio he needed to take with him to his security post. At about 3:50 p.m., Rios saw Rivera and asked why he was not at his post yet. Rivera again asked Bosques for the logbook and the radio, but Bosques again refused to give them to him. At about 3:55 p.m., Rios reappeared and told Rivera that he was late and demanded that he report to his post. Bosques finally gave Rivera the equipment at 4:00 p.m., and Rivera reported to his post at 4:05 p.m. At that time, Bosques approached Rivera and told him that he needed to change his attitude. Rivera claims he then became angry with Bosques, and that Bosques went to talk to Rios. Shortly thereafter, according to Rivera, he was ordered to turn in his radio, logbook, timecard, and identification card, and to report to Lewis the next day.

The parties agree that on April 19, 1996, Rivera met with Lewis, who was in charge of assigning Effective's security guards to various work sites. They also agree that Rivera told Lewis that Rios had been "unfair," but did not claim that Rios had engaged in any discriminatory or harassing conduct.

Defendants, however, assert that Lewis advised Rivera that Effective would reassign Rivera to another job site and gave him the option of being assigned to NYNEX or the Brooklyn Union Gas Co. Defendants contend that Rivera refused to work at either of the sites, and then never followed up with Effective about other jobs after Lewis told Rivera that he should check back later to see what other jobs were available.

Rivera, on the other hand, contends that Lewis did not mention that Effective would reassign him, and did not mention any other assignments. Rivera claims that Lewis dismissed him without any offers.

There is no dispute that Rivera did not work for Effective again after April 18, 1996.

*Diabetic Attacks*

Rivera suffered four diabetic attacks while he was working for Apple and Effective. On April 18, 1994, he suffered a hypoglycemic attack, resulting from a low level of sugar in his blood. After Rivera reported not feeling well, his supervisor Henriquez sent another security officer to replace Rivera and then assisted Rivera into the lobby of the BAT. Henriquez attempted to call an ambulance, but Rivera prevented him. Henriquez than arranged for another security officer to take Rivera home.

Rivera suffered another hypoglycemic attack on July 12, 1994, because he did not eat properly that day. He was taken to Lutheran Medical Center, where he stayed for two or three hours. He suffered a third attack on December 10, 1994. The supervisor on duty at the time, Colon,

responded quickly and brought Rivera a soda to drink. Rivera recovered and decided to continue working his shift.

Rivera suffered another attack on February 3, 1996, because he did not eat enough for breakfast. He returned to work after the attack and completed his shift.

Rivera was aware that he could control his diabetes with medication and a proper diet, and that a failure to eat properly could affect his health.

*Discrimination Charges*

 Rivera now alleges that Rios and Bosques harassed him while he was employed at Apple and Effective because of his diabetes and poor eyesight, and that they had conspired to get him removed from the BAT. Rivera complains that Rios and Bosques often made fun of his physical disabilities, calling him names such as "Cyclops" and "Freddy Krueger," and making statements like "Yo Freddie, is it true that diabetics can't get it up?" and "Hey Freddie! Is it true you're a homo?" [4] (Pl.'s Rebuttal of Def.'s Rule 56.1 Statement ("Pl.'s Rebuttal") at 1, 9–10.)

Indeed, while he was employed by Apple and Effective, Rivera twice reported to his superiors instances of what he believed to be harassment. On one occasion, Bosques laughingly told Rivera that a security officer named Fitzpatrick had called Rivera a "one-eyed handicap." (*Id.*) Rivera reported the incident to Rios, and Fitzpatrick later apologized to Rivera. The second time, Rivera complained to Giordano that Rios had publicly remarked that Rivera

had erectile dysfunction because of his diabetes. Giordano told Rivera that he would speak to Rios. Rivera claims that the next day Rios and Bosques put up a sign that read, "Freddy Cries For Help." (*Id.* at 8.)

After Rivera ceased working for Effective, he filed a charge against Apple with the Equal Employment Opportunity Commission ("EEOC") on April 23, 1996. He amended that charge on October 23, 1996, to include Effective.

In the EEOC charge, Rivera alleged that Rios had harassed him and made demeaning comments about his physical disabilities. In addition, Rivera claimed that defendants violated the ADA by assigning him to the jump tour even though he had specifically requested an accommodation that he not be assigned to a rotating shift, and by ultimately terminating him.

The EEOC dismissed Rivera's charge on March 3, 1998. Rivera then filed this action on April 24, 1998.

Meanwhile, on June 4, 1996, Rivera also applied for Social Security Disability Insurance ("SSDI"), asserting that as of April 3, 1996, he had a permanent disability that prevented him from working. Rivera is currently receiving Social Security disability payments.

*Discussion*

I. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

4. The Court denies Rivera's request in his December 8, 1999 letter that he be allowed to amend his complaint to include sexual harassment claims against defendants based on Rios' and Bosques' remarks concerning Rivera's alleged sexual orientation. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, does not prohibit discrimina-

tion based on sexual orientation. *See Simonton v. Runyon,* 232 F.3d 33, 35–36 (2d Cir. 2000). Any amendment to state such a claim is therefore futile. *See Marchi v. Board of Coop. Educ. Servs. of Albany,* 173 F.3d 469, 478 (2d Cir.1999) (court may deny leave to replead when amendment would be futile).

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999). The Court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir.1999).

The court is required to view the evidence in the light most favorable to the nonmoving party, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and must construe the *pro se* plaintiff's claims liberally in deciding the motion for summary judgment, *see Sawyer v. American Fed'n of Gov't Employees, AFL–CIO*, 180 F.3d 31, 36 (2d Cir.1999) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). Nevertheless, the non-moving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *National Westminster Bank USA v. Ross*, 676 F.Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.") No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

II. *The Americans With Disabilities Act*

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "disability" means:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see also* 29 C.F.R. § 1630.2(g).

 Claims for discrimination under the ADA are subject to the same burden shifting framework for analyzing Title VII discriminatory treatment cases enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified more recently in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 56 (2d Cir.1998); *Morlino v. Staten Island Univ. Hosp.*, No. 95 CV 3891, 1998 WL 160937, at *5 (E.D.N.Y. Apr.1, 1998), *aff'd*, 173 F.3d 845, 1999 WL 197213 (2d Cir.1999). The plaintiff must first establish a prima facie case of discrimination. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *see also James v. New York Racing Assoc.*, 233 F.3d 149, 153 (2d Cir.2000). If the plaintiff has satisfied that requirement, it is presumed that the em-

ployer did discriminate against the employee, and the burden shifts to the defendant to rebut the prima facie case by introducing admissible evidence of a legitimate, nondiscriminatory reason for its actions. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *James,* 233 F.3d at 154. Once the defendant meets this burden, the presumption of discrimination "drops out of the picture." *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742. The plaintiff is then left to prove that he was, in fact, the victim of unlawful discrimination. *Id.* at 508, 113 S.Ct. 2742.

In determining whether summary judgment is appropriate, the court must make a "case-by-case" determination based on a review of the entire record. *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000). An employer will be entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James,* 233 F.3d at 154. The court may consider factors including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] that employer's case . . ." *Id.* at 156 (quoting *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097) (brackets added in quotation). A plaintiff's prima facie case alone, combined with a showing that the employer's asserted justification is false, although not always sufficient, may in some instances permit a finding of discrimination. *See Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097.

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) that he was an individual who has a disability within the meaning of the statute; (2) that his em-

ployer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of his position; and (4) that his employer either refused to make such accommodations or discharged the employee because of his disability. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 (2d Cir. 2000); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998).

In this case, even construing the facts in his favor, Rivera fails to establish a prima facie case of discrimination under the ADA. Rivera cannot show that he was disabled for the purposes of the ADA while he was employed by defendants. Further, even if the Court were to assume that he was disabled under the ADA, Rivera cannot show that defendants ever refused to grant him an accommodation that he sought, or discriminated against or discharged him because of such disability. The Court therefore grants defendants' motion for summary judgment.

A. *"Disability"*

In determining whether a plaintiff's impairments constitute a "disability" under the ADA, the Supreme Court has noted that three requirements must be met. *See Bragdon v. Abbott,* 524 U.S. 624, 632–639, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 641 (2d Cir.1998). First, plaintiff's condition must be a "physical impairment." *Bragdon,* 524 U.S. at 632, 118 S.Ct. 2196. Second, plaintiff must assert a "major life activity" that is affected by the impairment. *Id.* at 637, 118 S.Ct. 2196. Third, the impairment must be "a substantial limit on the major life activity [he] asserts." *Id.* at 639, 118 S.Ct. 2196.[5]

---

5. The EEOC's regulations, which although not binding are entitled to "great deference,"

*Muller v. Costello,* 187 F.3d 298, 312 (2d Cir.1999), provide guidance as to the ADA's

In considering such factors, the Supreme Court has noted that a court must make reference to corrective measures. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 488, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). For example, if a person with poor vision is able to function without limitation by wearing glasses or contact lenses, then he is not disabled under the ADA. *See id.; see also Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 520–21, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (use of medication to correct high blood pressure); *Muller v. Costello,* 187 F.3d 298, 314 (2d Cir.1999) (use of inhalers and medication to correct asthma).

Rivera alleges that he has two disabilities for purposes of the ADA—diabetes and poor eyesight (due to the lack of vision is his left eye and reduced vision in his right eye). Although both diabetes and poor vision are plainly physical impairments, *see e.g.,* 29 C.F.R. § 1630.2(h)(1) (a physical impairment includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine"), Rivera has not established that the impairments substantially limit him in one or more of his major life activities.

■ With respect to his diabetes, Rivera acknowledges that with insulin injections and a proper diet, he can control his diabetes and prevent diabetic attacks.

Under the reasoning in *Sutton,* therefore, since Rivera can control his diabetes, he does not have a disability for purposes of the ADA. *Cf. Sutton,* 527 U.S. at 483–84, 119 S.Ct. 2139 (remarking in dicta that it would not make sense to disregard corrective measures in determining disability under the ADA because otherwise "courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they almost certainly be substantially limited in one or more major life activities."). Although it may well be the case that certain individuals with diabetes could show that they would still be significantly limited in their life activities even with medication, Rivera does not contend that he falls into this category or put forth any evidence to show that, with proper treatment, he is not an otherwise fully capable individual.

■ Rivera also fails to show that his poor eyesight limited him in performing his major life activities while he was employed by defendants. Indeed, Rivera has repeatedly conceded that while his eyesight was poor, he could see well enough to perform his job. *See* Pl.'s Rebuttal at 1; Deposition of Alfredo Rivera ("Rivera Dep.") at 45 ("But my eyesight was at least well enough to work..."). To be sure, "working" is only one of a number of "major life activities." 29 C.F.R. § 1630.2(i). Even assuming, however, that Rivera is limited to some extent in "seeing," another major life activity, *see id.,* he

meaning. The regulations define "substantially limits" to mean "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). They define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

has not made a sufficient showing that his eyesight was substantially limited.

In *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), the Supreme Court held that an individual like Rivera, who could not see out of his left eye, was not categorically disabled under the ADA. The Court stated that although it believed that "people with monocular vision 'ordinarily' will meet the [ADA]'s definition of disability," a plaintiff must offer evidence that the extent of their limitation "in terms of their own experience, as in loss of depth perception and visual field" is substantial. *Id.* at 567, 119 S.Ct. 2162. Here, Rivera has failed to make such a showing, and to the contrary, asserts that at the time he was working, his eyesight was not substantially limited.[6]

■ For the same reasons, Rivera also fails to establish that he is disabled for purposes of the ADA because he has a record of past impairment. *See* 42 U.S.C. § 12102(2)(B). The only impairments Rivera complains of are his diabetes and poor vision. As the Court has concluded that Rivera's diabetes and poor vision do not suffice to constitute a disability under the ADA, a past history of such impairments also fails to constitute a disability. "The

6. As indeed he must, since Rivera does not claim that he required an accommodation due to his poor vision. If he was to contend that he could not see well enough to work as a security guard, then he would not be able to satisfy the ADA's requirement that he could perform the essential functions of his job.

7. Summary judgment is further appropriate with respect to any of Rivera's claims for damages after he left Effective because Rivera cannot show he was a "qualified individual" under the ADA at such time. To be a "qualified individual," a plaintiff with a disability must, with or without accommodation, be able to "perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

record must be one that shows an impairment that satisfies the ADA." *Colwell*, 158 F.3d at 645.

■ Finally, Rivera also fails to establish that he was regarded by his employers as having an impairment. *See* 42 U.S.C. § 12102(2)(C). Although Rivera's employers were plainly aware of his physical impairments, "[i]t is not enough ... that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA.*" *Id.* at 646 (italics in original); *see also Francis v. City of Meriden*, 129 F.3d 281, 285 (2d Cir.1997) ("[T]he plaintiff must allege that the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis."). In this case, Rivera has not made any allegation, or attempted to show, that either Apple or Effective considered Rivera to be impaired under the terms of the ADA.

■ As Rivera cannot establish that he suffers from a disability for the purposes of the ADA, summary judgment is appropriate.[7]

The plaintiff bears the burden of making such a showing. *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 287 (S.D.N.Y.1999), aff'd, 205 F.3d 1327, 2000 WL 232048 (2d Cir.2000).

Rivera has maintained throughout, in connection with the instant case, that he could still perform his job at Effective despite his physical impairments. However, Rivera has previously sworn to the Social Security Administration in his application for disability benefits that he was completely disabled as of April 3, 1996, and could no longer work.

Although the Court credits Rivera's claim regarding his capabilities prior to the time he left Effective, under the Supreme Court's recent holding in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 807, 119

## B. *Discrimination*

In any event, even if Rivera were able to establish a prima facie case of discrimination under the ADA, he cannot show that defendants either refused to make an accommodation necessary for him to perform his job or discharged him as a result of his disability.

### 1. *Accommodation*

A claim for disability discrimination based on a failure to accommodate a plaintiff "is not made out under the ADA unless the employee's request for a reasonable accommodation has been denied by the employer." *Mazza v. Bratton*, 108 F.Supp.2d 167, 176 (E.D.N.Y.2000). As there is absolutely no evidence that Rivera ever requested an accommodation based on his diabetes (or his poor eyesight for that matter), his accommodation claim fails as a matter of law, to the extent that he asserts such claim here.[8] *See Baker v. City of New York*, No. 97 CV 5829, 1999 WL 33115, at *4 (E.D.N.Y. Jan. 22, 1999) ("[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.") (quotation omitted).

Rivera admits that he did not mention in his employment application with either Apple or Effective that he needed any special shift assignment as a result of his disability. Moreover, when Rivera was reassigned to a rotating shift, the jump tour, he did not complain about being placed on that shift or tell anyone that the new hours might interfere with his ability to properly administer his insulin. Nor does it appear that he ever asked to be removed from the shift as an accommodation for his disability.[9]

Rivera does not, in any event, even present any evidence that he in fact needed such an accommodation to perform his job. Instead, when Rivera was questioned about the jump tour at his deposition, he stated that he did not complain about the reassignment at first because he "wanted to see what happen[ed] the first week, to see if it works out or not" and that he ultimately found the new shift to be "wonderful." (Rivera Dep. at 344–45.) Based on the undisputed facts presented here, it is plain that no reasonable trier of fact could find that Rivera had ever been denied a request for a reasonable accommodation.

### 2. *Discharge*

Likewise, although the parties dispute whether Rivera was fired or whether he left Effective on his own accord, even accepting Rivera's version of events, Riv-

S.Ct. 1597, 143 L.Ed.2d 966 (1999), he will be assumed to be completely disabled after April 3, 1996 and unable to perform his job. Rivera has failed to offer any explanation reconciling his claim for, and receipt of, SSDI benefits and his ADA claim. He simply continues to maintain that he could have, in fact, performed his job. The Court does not find that such statement is "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the . . . statement [to the SSA], the plaintiff could nonetheless 'perform the essential functions' of [his] job, with or without 'reasonable accommodation.'" *Id.; see DiSanto v. McGraw–Hill, Inc./Platt's Div.*, 220 F.3d 61, 64–65 (2d Cir.2000); *Mitchell v. Washington-*

*ville Cent. Sch. Dist.*, 190 F.3d 1, 6–7 (2d Cir.1999).

8. Rivera's complaint does not mention the denial of an accommodation, but Rivera did raise the argument in his EEOC charge.

9. At best, Rivera alleges that at some point he told Rios that he needed a regular shift as an accommodation for his disabilities. This statement, however, is belied by his admissions that he did not state on his employment applications that he needed a special shift and that he never complained about being assigned to the jump tour.

era cannot establish that he was in fact terminated by Effective because of his disability. Defendants have introduced substantial evidence showing that if Rivera was terminated, he was terminated for a legitimate, non-discriminatory reason—they were simply not satisfied with his job performance. *See Badrinauth v. Touro College,* No. 97 CV 3554, 1999 WL 1288956, at *5 (E.D.N.Y. Nov. 4, 1999).

Rivera concedes at the very least that he had been found watching television while on duty, had failed to report that he physically restrained two children who had wandered onto the BAT's premises, had gotten into an altercation with another security guard, and had been caught sleeping at his post.[10] As a result of these incidents, Rivera had been suspended for five days, and ultimately reassigned to a different shift. Effective has thus put forth ample evidence that Rivera's job performance was inadequate, and that he was terminated for performance reasons. *See Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (courts may rely on the employer's assessments in determining whether job performance is satisfactory).

 Although Rivera disputes that he was terminated by Effective for legitimate reasons, he fails to "show[ ] that the defendant[s'] explanations are pretext for the true discriminatory motive," *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130–31 (2d Cir.1996), or "point to evidence that reasonably supports a finding of prohibited discrimination," *James,* 233 F.3d at 154. Rivera simply fails to offer any substantial evidence, circumstantial or otherwise, that he was in fact terminated because of his disability. For instance, he does not allege

that his termination closely followed one of his diabetic attacks or that his supervisors made any remarks about his disability in connection with his job performance or when they terminated him. At best, Rivera sets forth evidence that one of his supervisors, Henriquez, believed that Rivera was a good employee, and that Bosques and Rios had made disparaging remarks about Rivera's physical disabilities in contexts unrelated to his job performance. That is not sufficient to show that his discharge was based on discrimination.

Indeed, the facts of Rivera's case strongly suggest that his termination had nothing at all to do with his disability. For one, the person who recommended that Rivera be transferred from the BAT, Rios, was the same person who hired Rivera at Apple in the first place, fully aware of his physical impairments, and who later recommended to Effective that Rivera be retained in 1995. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) (when the same individual hires and fires an individual with a disability, "it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire"). Likewise, Bosques had helped Rivera not only secure a job at Apple, but also at New York Rail Car, where the two worked together for a few years before they were reunited at Apple.

In addition, Rios himself suffered from diabetes and poor vision, the same impairments that Rivera suffers from. Far from discriminating against Rivera because of his diabetes, Rios in fact made an effort in the summer of 1995 to help Rivera get his medical benefits from Effective sooner, be-

---

**10.** In addition, although Rivera disputes these events, his supervisors also reported that on one occasion Rivera failed to lock the doors to the loading dock as instructed and refused to explain why he was later found in the base- ment of the building, that he demanded to be relieved early one night and threatened to leave his post, and that he was late getting to his post and argued with his supervisors on his last night of employment with Effective.

cause he was aware Rivera was running low on insulin.

 Thus, even assuming that Rivera has made out a prima facie case of discrimination, summary judgment would still be appropriate. Once an employer puts forward a legitimate, non-discriminatory explanation for its conduct, "all presumptions and special rules drop away; ... the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim." *James*, 233 F.3d at 154. In this case, Rivera has failed to put forward enough evidence for a reasonable trier of fact to find that he had been terminated because he had diabetes or poor vision.

### III. *Retaliation*

 For the same reasons that Rivera fails to show his discharge was the result of discrimination, he also cannot show that defendants retaliated against him for complaining that he was being harassed, to the extent he makes such a claim.[11] The ADA prohibits discrimination against an employee because that employee has made a charge of discrimination under the ADA. 42 U.S.C. § 12203(a). In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) he was engaged in an activity protected by the ADA; (2) the employer was aware of that activity; (3) an employment action adverse to the plaintiff occurred; and (4) there existed a causal connection between the protected activity and the adverse employment action. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999); *Francis v. Chemical Banking Corp.*, 62 F.Supp.2d 948, 961 (E.D.N.Y.1999). The same burden shifting analysis that applied to plaintiff's discrimination claim applies to his retaliation claim as well. *See id.*

 Just as plaintiff is unable to prove defendants' proffered explanation for his termination was the result of unlawful discrimination, he is also unable to prove that his termination was in retaliation for his earlier complaints that he was being harassed.[12] The only evidence of retaliation that Rivera alludes to here is that Rios and Bosques allegedly posted a sign that read, "Freddy Cries For Help" after he complained to Giordano about being harassed sometime in 1994. That one incident, which occurred more that a year before he was terminated, is simply not sufficient to overcome Effective's proffered explanation for Rivera's dismissal.

### IV. *Hostile Work Environment*

 Finally, Rivera also fails to establish a hostile work environment claim.[13]

---

11. As with the accommodation claim, Rivera's complaint does not allege retaliation, although he raised such claim in his EEOC charge.

12. A plaintiff can be said to have engaged in a protected activity even if, as here, his charges do not ultimately state a violation of the ADA. *See Sarno*, 183 F.3d at 159 ("[A] plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law.") (quotation omitted).

13. Plaintiff's hostile work environment allegations appear to be entirely barred by the applicable statute of limitations. Under the ADA, a plaintiff's claims for discrimination are time-barred if they are not filed with the EEOC within 180 days of the alleged discriminatory actions. *See* 42 U.S.C. §§ 2000e–5(e) & 12117(a); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 (2d Cir.1999). The incidents of harassment that Rivera complains about, in particular Bosques' repeating to Rivera that another security guard had called him Rivera "one-eyed handicapped" and Rios' comments about Rivera's erectile dysfunction occurred before Effective took

At most, Rivera claims that he was harassed because Rios and Bosques constantly called him names such as "Cyclops" and "Freddy Krueger," said things to him like, "Yo Freddie, is it true that diabetics can't get it up?" and "Hey Freddie! Is it true you're a homo?", and broadcast such comments over the two-way radios that all of the security guards were equipped with, and occasionally over a CB radio. While crude and offensive, these actions are not sufficient to show a hostile work environment.

 A plaintiff can prevail on a hostile work environment claim only "[w]hen the workplaces is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotations omitted); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767 (2d Cir. 1998). The workplace must be evaluated "on the totality of the circumstances," *see Quinn*, 159 F.3d at 767, and the court can consider factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it is unreasonably interferes with an employee's work performance," *id.* at 767–68 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Hostile work environment claims, however, "are meant to protect individuals from abuse and trauma that is

severe" and "are not intended to promote or enforce civility, gentility, or even decency." *Curtis v. DiMaio*, 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999), *aff'd*, 205 F.3d 1322, 2000 WL 232060 (2d Cir.2000).

In this case, in light of the totality of the circumstances, Rivera cannot show a hostile work environment. There is no question that Rios' and Bosques' comments to Rivera were childish and mean-spirited. Nevertheless, "[a]lthough the alleged comments are despicable and offensive, they fail to constitute discriminatory behavior that is sufficiently severe or pervasive to constitute a hostile environment." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 708 (2d Cir.1998).

The remarks Rivera complains about fall short of altering the conditions of Rivera's employment or creating an abusive working environment. This is especially true given that Rivera acknowledges that he generally had a very good working relationship with his supervisors. His supervisors, including Rios and Bosques, were aware of Rivera's diabetes and would help Rivera out from time to time by providing him with food. Each time that Rivera had a diabetic attack at work, a supervisor promptly came to his aid. Moreover, as already discussed, Rios at one time requested that Effective expedite Rivera's request for medical benefits because he was aware that Rivera was low on insulin. In spite of Rios' and Bosques' distasteful comments about Rivera, therefore, Rivera cannot show that his workplace was permeated with severe and pervasive discriminatory conduct.

---

over providing security services at the BAT in February 1995. Likewise, the remarks that Henriquez claims to have overheard occurred sometime before November 1994. Since Rivera did not file his EEOC charge until April 25, 1996, any claims relating to such harassment are statutorily barred. Nevertheless,

since Rivera alleges that Rios and Bosques continually joked about Rivera's physical disabilities, and some of their remarks may have been made within the relevant statutory period, the Court will consider his allegations of harassment.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is instructed to enter judgment for the defendants and to close the case.

SO ORDERED.