Lohengryn **GONZALEZ, Plaintiff,**

v.

**RITE AID OF NEW YORK, INC., Defendant.**

**No. 00 CIV. 9549(DC).**

United States District Court, S.D. New York.

April 23, 2002.

Order Denying Reargument May 8, 2002.

Ganz & Hollinger, P.C. by David L. Ganz, Esq., Jeremy A. Welfer, Esq., New York City, for Plaintiff.

Law Office of Jay S. Haberman, Esq. by Mark D. Lefkowitz, Esq., New York City, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this action, plaintiff Lohengryn Gonzalez sues Rite Aid of New York, Inc. ("Rite Aid") for discrimination on the basis of disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"). He contends that Rite Aid failed to promote him because of his heart condition. Gonzalez also asserts wage and hour claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), and the New York State Labor Law. N.Y. Lab. § 190 *et seq.* (McKinney 2001) (the "Labor Law"). Plaintiff seeks reinstatement, money damages, and attorney's fees.

Rite Aid moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that Gonzalez has failed to establish a *prima facie* case of discrimination under the ADA, or in the alternative, on the ground that Rite Aid denied Gonzalez a promotion for legitimate business reasons: he posed a security risk. Rite Aid also argues that the FLSA claim is time-barred, and that, assuming both federal claims are dismissed, the Court should decline to exercise its supplemental jurisdiction to hear the Labor Law claim. For the reasons set forth below, Rite Aid's motion is denied.

## BACKGROUND

### I. Facts

Construed in the light most favorable to plaintiff, the facts are as follows:

#### A. Gonzalez's Medical History

Gonzalez, a thirty-one year-old man, suffers from a variety of heart ailments. (Declaration of Christine A. Walsh, M.D. at ¶ 3). He was born with several heart defects and underwent open heart surgery when he was an infant. (*Id.* at ¶¶ 3, 4).

In September, 1982, a stress test revealed that Gonzalez's abnormal heart rhythms were increasing. Thereafter, he continued to receive medication, periodic testing, and monitoring. (*Id.* at ¶¶ 5–7).

Currently, Gonzalez still suffers from hemodynamic problems and abnormal heart rhythms, including "mild aortic insufficiency, mild mitral regurgitation, mild tricuspid regurgitation and mild pulmonary stenosis." (*Id.* at ¶¶ 11, 12). Plaintiff's "aortic, mitral and tricuspid heart valves leak, and he has mild stenosis— pressure difference across the pulmonary valve." (*Id.* at ¶ 12). He has sick sinus syndrome with complex ventricular ectopy, which "increases with exercise. As a result, he has been restricted from strenuous activity and sports." (*Id.* at ¶ 13). Gonzalez has also been diagnosed with several other conditions. (*Id.* at ¶¶ 14–16).

His treating physician, Dr. Christine Walsh, states in her declaration that "since the beginning of my treatment of Mr. Gonzalez, it has always been and continues to be a probability that he will need a pacemaker implanted to treat the various issues that affect his heart." (*Id.* at ¶ 18). Dr. Walsh opines that Gonzalez "can work, but he should not perform strenuous activity or competitive sports. As previously discussed, the reason for these limitations is that the more activity that he engages in, the worse and more frequent his abnormal heart rhythms become." (*Id.* at ¶ 19).

At his deposition, Gonzalez stated that he has not been allowed to play sports since the age of three, and that his doctors "didn't want [him] to do a lot of walking or go up steps or nothing." (Pl. Dep. Tr. at 19). His doctors continue to restrict him from "doing any extreme physical exercises" including "running long distances, strenuous lifting. That kind of exercise that takes a lot of you to do." (*Id.* at 22).

### B. *Gonzalez's Employment History*

Gonzalez was employed as a cashier/stock person at the Rite Aid located at 1540 Grand Concourse, the Bronx, New York, (the "Grand Concourse store") from July 1998 through December 1998. (Declaration of Seymour Bunyan, Jr. at ¶¶ 1–2; Declaration of Rafael Maldonado at ¶¶ 1–2; Pl. Dep. Tr. at 29). Gonzalez had previously worked at other Rite Aid stores in Manhattan and Spanish Harlem, beginning in December 1997. (Pl. Dep. Tr. at 23–24). Gonzalez informed a manager at each Rite Aid store of his health problems and that "I can't lift real heavy stuff." (*Id.* at 24). Gonzalez also wrote that he had a heart condition on his job application. (*Id.* at 23). Although the record is unclear as to the reasons for the termination of Gonzalez's employment, it appears he left Rite Aid in December 1998 voluntarily, as he testified at his deposition that he "was never terminated." (*Id.* at 30).

### C. *Gonzalez's Overtime*

When Seymour Bunyan ("Bunyan") became manager of the Grand Concourse Rite Aid in July 1998, there was a lot of overstock that the previous manager had failed to categorize. (Bunyan Decl. at ¶ 4). Michael Mallin ("Mallin"), a district manager for several Rite Aid stores including the Grand Concourse store, told Bunyan that he had to bring the overstock down to a manageable level by putting it on the shelves or transferring it to another store. (*Id.* at ¶ 5). Mallin further instructed Bunyan to work on the overstock problem during the "off-store hours," namely, after the store closed at 9:00 p.m. (*Id.* at ¶ 6). Rite Aid's overtime policy required the permission of a district manager before employees could work overtime; accordingly, Bunyan spoke to Mallin in August, 1998 and obtained permission for employees to work overtime. (*Id.* at ¶¶ 7–8).

Gonzalez was one of the Rite Aid employees who worked on the overstock problem after hours. (*Id.* at ¶¶ 10–11; Maldonado Decl. at ¶¶ 5–7). Gonzalez also worked on planograms, or changing of store displays for seasonal purposes, as well as inventory. (Bunyan Decl. at ¶¶ 12–14). During the ten month period that Bunyan managed the Grand Concourse store Gonzalez "worked overtime every week" and "on average, Mr. Gonzalez worked approximately 60 hours of overtime per week." (*Id.* at ¶¶ 22, 42).[1] Bunyan prepared Gonzalez's time sheets and payroll reports from August 1998 through December, 1998, and those records "consistently reflected the overtime hours worked by Mr. Gonzalez." (*Id.* at ¶ 21).

When Bunyan began working at the Grand Concourse store, Gonzalez complained that he was not receiving a paycheck. (*Id.* at ¶ 25). Twelve weeks later, Gonzalez received a paycheck, but that paycheck did not include his overtime. (*Id.* at ¶ 26). Gonzalez complained about his overtime pay every week until Bunyan stopped working at Rite Aid.

After hearing Gonzalez's complaint, Bunyan checked the weekly hours on the computer, and found that those hours were different than the hours that Bunyan had entered. (*Id.* at ¶ 28). Bunyan "entered the hours Mr. Gonzalez worked, which included an average of 60 overtime hours per week, on the payroll computer. I never lowered the hours worked by Mr. Gonzalez that I entered on the payroll computer." (*Id.* at ¶ 40).

---

1. According to Mallin, "the hours claimed by Mr. Gonzalez ... are so disproportionate as to be incredible" and he had no knowledge that Gonzalez was working overtime. (Declaration of Michael Mallin, dated December 20, 2001, at ¶¶ 5, 6).

Bunyan advised Dawn Mallone ("Mallone") of Human Resources, verbally and by e-mail, that Gonzalez was not being paid for his overtime. Bunyan sent copies of these e-mails to Mallin and also discussed the issue with Mallin, who replied that he was "working on it." (*Id.* at ¶¶ 29–30). In November of 1998, Gonzalez, Bunyan, and Mallin met to discuss the fact that Gonzalez was not being paid for his overtime. Mallin's response was " 'OT' stands for 'own time.' " (*Id.* at ¶ 31). After this meeting, Bunyan wrote an e-mail to Mallone complaining about Gonzalez's unpaid overtime. (*Id.* at ¶ 33). Gonzalez also sent letters to his union, Local 1199, which Bunyan reviewed, although the union has no record of those letters. (*Id.* at ¶ 34; Pl.Ex. I). Bunyan also witnessed an incident where a union representative came to the Grand Concourse store and had a "shouting match" with Mallin regarding unpaid overtime hours for Gonzalez and another Rite Aid employee. (*Id.* at ¶¶ 35–38).

Donald J. Krupka, a Rite Aid Human Resource Manager, and Denise Hondorf, the head of the Payroll Department at Rite Aid, provided affidavits describing the payroll procedures at Rite Aid. During 1998, employees' weekly hours were transmitted to the payroll department as follows: certain personnel at each Rite Aid store would enter the employee hours worked during that week in the store computer. (Hondorf Aff. at ¶¶ 2–3). Those records were then electronically transmitted to the payroll computer at the payroll department at Rite Aid headquarters in Camp Hill, Pennsylvania prior to midnight of each Saturday of each week. (*Id.* at ¶ 3). "Upon receipt of the payroll data entry, the payroll would automatically be processed and issued and employee payroll checks would be issued based upon that transmitted data." (*Id.* at ¶ 4). To change payroll data for an individual employee, someone would need to gain access to payroll data in the retail store's computer— which is password protected— and alter the data before its transmission to the payroll department. (*Id.* at ¶ 5).[2]

## D. *Plaintiff's Disciplinary Record*

Gonzalez received one disciplinary write-up while working for Rite Aid, for a dress code violation while working at the Grand Concourse store. (Pl. Dep. Tr. at 30). Gonzalez also had a "heated" argument with the manager of the first Rite Aid store at which he worked. (*Id.* at 30–31). Gonzalez had left the store to get something to eat, and when he returned to the store, the manager called Gonzalez into his office and "got loud" with him. (*Id.* at 31). They then "got into a heated argument" and Gonzalez "walked out of the store." (*Id.*). Gonzalez then saw a police officer walk into the store, and Gonzalez re-entered the store. The police officer told Gonzalez "that he didn't want me in the store, to come back and pick up my check. The co-manager told me look, don't worry about it, pick up your check, come see me; and I left it like that." (*Id.*). The police did not question Gonzalez, and no charges were filed. (*Id.* at 34). A few days later, Gonzalez started working at the Rite Aid store in Spanish Harlem. (*Id.* at 34).[3]

---

**2.** Both Krupka and Hondorf claim to have been unaware of any problems with plaintiff's paychecks. (Krupka Aff. at ¶¶ 5–7; Hondorf Aff. at ¶¶ 8–10).

**3.** Krupka provides a description of an incident at a Manhattan store that may be the same incident; from the record before the Court, it is impossible to tell, as neither party provides dates of the alleged disagreements.

According to Krupka, plaintiff not only engaged in an argument but "threatened to kill the Rite Aid store manager at that other location." (Krupka Aff. at ¶ 10). Attached to Krupka's declaration is a report describing a

### E. *The Promotion*

Bunyan made a written recommendation to Mallin that plaintiff be promoted to assistant manager. (Bunyan Decl. at ¶ 43). In addition, Mallin told Gonzalez that he was going to promote him to the position of assistant manager. (Pl. Dep. Tr. at 71–72). In Bunyan's opinion, Gonzalez "was qualified to be promoted to assistant manager or key cashier because Mr. Gonzalez was already unofficially performing all the tasks that an assistant manger or key cashier would perform, except those tasks involving the codes to the registers for overrides and the codes for the safe." (Bunyan Decl. at ¶ 43). The assistant manager position did not require more physical labor than the position of clerk/cashier. (Pl. Dep. Tr. at 70).

To be promoted, Gonzalez had to meet with three people; the Assistant Human Resource Director, the head of Human Resources, and the head of Loss Prevention. (Bunyan Decl. at ¶ 46). Gonzalez met with at least two of those individuals, and both informed Bunyan that plaintiff had "passed" their interviews. (*Id.* at ¶ 47; Pl. Dep. Tr. at 73–74).

In November, 1998, Mallin told Bunyan that Gonzalez was not being promoted "due to health reasons." (Bunyan Decl. at

¶ 48). A week later Mallone also informed Bunyan that Gonzalez was not being promoted because of his health. (*Id.* at ¶ 48). Neither Mallin nor Mallone provided Bunyan with any other reasons why Gonzalez was not receiving a promotion. Mallin also told Gonzalez that he was not going to be promoted because of health reasons. (Pl. Dep. Tr. at 76, 156). Maldonado also approached Mallin about promoting Gonzalez; Mallin said that he "didn't think so because Leo [Mr. Gonzalez] had a 'health problem.'" (Maldonado Decl. at ¶ 22).[4]

## II. *Procedural History*

On March 31, 1999, Gonzalez filed a complaint with the Equal Employment Opportunity Commission (the "EEOC") against Rite Aid, alleging discrimination based on disability. (Second Amended Compl. at Ex. 1). The EEOC issued Gonzalez a right-to-sue letter, dated September 19, 2000. (*Id.* at Ex. 2).

On December 15, 2000, within ninety days after receipt of the right-to-sue letter, Gonzalez commenced this action. He subsequently amended his complaint on January 8, 2001, and April 10, 2001.

This motion followed.

---

security investigation conducted by Philip Fallon ("Fallon"), Rite Aid's regional head of security. (*Id.* at Ex. A). The report is dated as having commenced on November 9, 1998 and having concluded on November 11, 1998. Fallon writes "interview with Leo Gonzalez resulted in him telling me he worked in # 4419 and 4196. Previously, I spoke with Peter Lopez who managed # 4196. He said he fired Gonzalez for threatening to kill him. We have no idea how he was hired after this incident." (*Id.*). It appears that this investigation was made after plaintiff sought a promotion. Again, to the extent there is a conflict in the evidence, for the purposes of this motion I accept Gonzalez's version.

4. In contrast, Mallin and Krupka both deny that they ever made statements to anyone asserting that Gonzalez was denied the promotion because of his heart problems. (Mallin Aff. dated Dec. 20, 2001, at ¶ 8; Krupka Aff. at ¶ 12). Both Mallin and Krupka claim that Gonzalez was denied the promotion because of security concerns. (Mallin Aff. dated Nov. 6, 2001, at ¶ 8; Krupka Aff. at ¶ 10). Mallin also states that "the job responsibilities of assistant manager, or key cashier, as sought by Mr. Gonzalez do not require any more physical work than that which was required of Mr. Gonzalez as a clerk/cashier for Rite Aid." (Mallin Aff. dated Dec. 20, 2001, at ¶ 8). For purposes of this motion, I assume that Gonzalez's statements are true.

## DISCUSSION

Rite Aid moves for summary judgment on the grounds that: (1) Gonzalez does not have a disability within the meaning of the ADA; (2) even if Gonzalez does have a disability, he has not shown that the failure to promote was motivated by that disability; and (3) Gonzalez's FLSA claims are time-barred. Assuming that the Court dismisses the federal claims, Rite Aid argues that the Labor Law claim should be dismissed as well for lack of subject matter jurisdiction.

On the record before the Court, I conclude that there are triable issues of fact such that a reasonable jury could find that Rite Aid failed to promote plaintiff based on his disability and that Rite Aid withheld overtime wages from Gonzalez in violation of the FLSA and the Labor Law. Hence, Rite Aid's motion for summary judgment is denied.

### A. *Summary Judgment*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.* 936 F.2d 112, 116 (2d Cir.1991).

A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *see Fleurcius v. Short Line Hudson Transit Bus*, 2000 WL 1863536, at *4, 2000 U.S. Dist. LEXIS 18261, at *10–11 (S.D.N.Y. Dec. 20, 2000). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. As the Court stated in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. *The ADA Claim*

Gonzalez alleges that he was denied a promotion as a result of his disability in violation of the ADA.

#### 1. *Applicable Law*

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Buckley v. Consolidated Edison Co.*, 155 F.3d 150, 153–54 (2d Cir.1998). To survive this motion for summary judgment, Gonzalez therefore must present sufficient evidence from which a jury could find that: (1) Rite Aid is covered by the ADA; (2) he

suffers from a disability within the meaning of the ADA; (3) he was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001) (citations omitted).

■ To show that a plaintiff suffered an adverse employment action because of his disability, the causal relationship between the disability and the adverse employment decision need not be direct, and the plaintiff may establish that the decision was motivated by his disability by demonstrating that the disability caused conduct that, in turn, motivated the employer's decision. *Greene v. New York,* No. 95 Civ. 6580(DAB), 1998 WL 264838, *5 (S.D.N.Y. May 22, 1998). Moreover, the Second Circuit has held that a plaintiff need not prove that disability was the sole cause for the employer's decision. *See Parker,* 204 F.3d at 336–37. Instead, a plaintiff "must show only that disability played a motivating role in the decision." *Id.* at 337.

■ A "disability" within the meaning of the ADA includes: (1) a physical or mental impairment that substantially limits a major life activity; (2) a record of such an impairment; or (3) a perceived impairment. 42 U.S.C. § 12102(2). The existence of a disability is to be made on a case-by-case basis. *See Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 685, 151 L.Ed.2d 615 (2002) ("That the Act defines 'disability' 'with respect to an individual,' 42 U.S.C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner") (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)) (further citations omitted). To evaluate a claim of disability, first "the court deter-

mines whether the plaintiff suffered from a physical or mental impairment. Second, the court identifies the life activity indicated by the plaintiff and considers whether it qualified as a 'major life activity' under the ADA. Finally, the court determines whether the claimed impairment substantially limited the major life activity." *Sacay v. The Research Found. of the City Univ. of New York,* 193 F.Supp.2d 611, 626–27 (E.D.N.Y.2002) (citing *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

■ Not every physical or mental impairment is considered substantially limiting; "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota,* 122 S.Ct. at 691. "A plaintiff must do more than submit evidence of a medical diagnosis[; he] must offer 'evidence that the extent of the limitation caused by [the] impairments in terms of [her] own experience is substantial.'" *Sacay,* 193 F.Supp.2d at 626–27 (E.D.N.Y.2002) (citing *Toyota,* 122 S.Ct. at 691–92).

The ADA does not define "major life activities," but the regulations promulgated by the EEOC under the ADA include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" as "major life activities." *Sacay,* at 626–27 (quoting 29 C.F.R. § 1630.2(i)) (further citations omitted); *but see Toyota,* 122 S.Ct. at 689–90. At least one court in the Southern District has held that "strenuous activity" does not constitute a major life activity under the ADA. *See Epstein v. Kalvin–Miller Int'l, Inc.,* 100 F.Supp.2d 222, 225 (S.D.N.Y.2000) (Leisure, J.). In so holding, Judge Leisure observed that the term "strenuous activity" "is ill-de-

fined, insofar as it suggests a quantitative measure of exertion rather than an activity, as specified by the ADA." *Epstein,* 100 F.Supp.2d at 225.

 "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason." *Stratton v. Dep't for the Aging,* 132 F.3d 869, 878 (2d Cir.1997) (citations omitted). In the absence of direct evidence of discrimination, the Second Circuit applies the burden-shifting framework for federal discrimination claims set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998) (applying *McDonnell Douglas* framework in ADA case). In a case such as this one, however, where plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* test is inapplicable. *See, e.g., Stratton,* 132 F.3d at 878; *Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506, 514 (S.D.N.Y.1998).

 In cases where a plaintiff presents direct evidence of discrimination, "mixed-motive" analysis is more appropriate. A plaintiff may establish a "mixed-motive" case by "convinc[ing] the trier of fact than an impermissible criterion in fact entered into the employment decision." *Stratton,* 132 F.3d at 878 n. 4 (quoting *Tyler v. Bethlehem Steel,* 958 F.2d 1176, 1181 (2d Cir.1992)) (further citations omitted). If the employee convinces the trier of fact, he succeeds unless his employer proves an affirmative defense; "that is, that it would have reached the same decision as to [the employee's employment] even in the absence of the impermissible factor." *Tyler,* 958 F.2d at 1181 (citations omitted).

### 2. *Application*

Gonzalez undoubtedly satisfies the first and third prongs discussed above. Rite Aid is an employer within the meaning of the ADA. *See* 42 U.S.C. § 12111(5)(A); *see, e.g., Giordano,* 274 F.3d at 747. Rite Aid appears to concede that Gonzalez was qualified to perform as an assistant manager. (Def. Mem. at 7). There also is no dispute as to the first part of the fourth prong, as Gonzalez was also subject to an adverse employment action: he was denied a promotion. *See* 42 U.S.C. § 12112(a).

The parties do dispute, however, whether Gonzalez has presented sufficient evidence with respect to the second prong, whether Gonzalez suffers from a disability within the meaning of the ADA, and the second part of the fourth prong, whether he suffered the adverse employment action "because of" his disability.

### a. *Plaintiff's Heart Condition*

 Gonzalez's heart ailment is a physical impairment within the meaning of the ADA. *See Bragdon,* 524 U.S. at 631–33, 118 S.Ct. 2196. On the record before the Court, viewing the evidence in the light most favorable to Gonzalez, I conclude that a reasonable jury could find that his heart ailment substantially limits a "major life activity." According to Gonzalez's physician, Gonzalez "can work, but he should not perform strenuous activity or competitive sports." Dr. Walsh does not define "strenuous activity," but plaintiff himself explains that he is precluded from engaging in "extreme physical exercises," such as "running long distances, strenuous lifting. That kind of exercise that takes a lot of you to do."

Gonzalez has presented evidence that he suffers from serious heart ailments, including irregular heart rhythms. Although the

record also contains evidence that he did perform physical work at Rite Aid, including unloading trucks, working the stock, and cleaning the store, the fact that he may have performed some physical work does not preclude a finding that he should not have been engaging in such physical activity, and that doing so placed him at risk.

■ The Supreme Court's decision in *Toyota* surely will make it more difficult for Gonzalez to prevail, but I cannot conclude that he will not be able to do so as a matter of law. The Court there held that to be "substantially limited in performing manual tasks, the individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota*, 122 S.Ct. at 691. The question of whether "extreme physical exercise," "strenuous lifting," and "strenuous activity" in general are activities that are of "central importance to most people's daily lives" is best decided by a jury at trial. The same inquiry exists with respect to the major life activity "manual tasks."

Even if Gonzalez were not substantially limited in a major life activity, the inquiry would not end. "The third way to prove a 'disability' within the meaning of the ADA is to prove that the plaintiff is 'regarded as' having an impairment that substantially limits one or more major life activities." *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir.1998), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999) (quoting 42 U.S.C. § 12102(2)(c)). The essential issue in making this determination is not whether Gonzalez is actually disabled, but whether Rite Aid perceived him to be disabled within the meaning of the ADA. *See Rivera v. Apple Industrial Corp.*, 148 F.Supp.2d 202, 214 (E.D.N.Y.2001). Gonzalez has pre-

sented concrete evidence that Rite Aid perceived him to be disabled. Mallin's comments to Gonzalez, Bunyan, and Maldonado regarding the promotion constitute sufficient evidence from which a reasonable juror could find that Rite Aid perceived plaintiff to be disabled within the meaning of the ADA.

**b. *Causation***

■ Rite Aid argues that the decision not to promote Gonzalez was based not on his disability but on the security risk Gonzalez posed as a result of the incident at the Manhattan store. Rite Aid presents the declarations of several Rite Aid employees to support this assertion. Rite Aid also points to portions of Gonzalez's deposition in which he admits to having a "heated argument" with a manager. Rite Aid also highlights portions of the investigation results attached to Krupka's declaration. (Krupka Decl. Ex. A). In the report, Fallon wrote:

> Interview with Leo Gonzalez resulted in him telling me he worked in # 4419 and 4196. Previously, I spoke with Peter Lopez who managed # 4196. He said he fired Gonzalez for threatening to kill him. We have no idea how he was hired after this incident, he was interviewed also for keys and obviously is O.I. He also admits during the interview to having a heart problem, open heart surgery, hole in his heart and being on medication. . . .

(*Id.*). This document, however, does not preclude a finding that Rite Aid denied Gonzalez the promotion because of his health. First, the document itself provides evidence that Gonzalez's medical decision was a factor in Rite Aid's decision. Second, the record contains direct evidence that Rite Aid denied Gonzalez the promotion because of his impairment (or perceived impairment). If the jury believes

Gonzalez and Bunyan, it could reasonably find causation. Likewise, the jury must decide whether Rite Aid's stated reason for dismissing plaintiff was pretextual.

## C. *Wage and Hour Claims*

### 1. *Applicable Law*

### a. *FLSA*

Gonzalez also brings a claim for failure to pay overtime under the FLSA. The FLSA sets minimum requirements for wage and overtime payments and prohibits employment for more than a specified number of hours per week without proper overtime compensation. 29 U.S.C. §§ 201–13; *see also* 29 C.F.R. § 785.5. The statute contains exceptions for certain types of employees, but Rite Aid does not contest whether Gonzalez would be covered under the statute.

The enabling regulations of the FLSA make clear that "hours worked" exceeding 40 hours per week must be compensated at special overtime rates. 29 C.F.R. §§ 7:16, 7:39. Employees may not be employed for more than a certain number of hours per week, depending on their occupation, without receiving at least one and one-half times their regular pay for overtime hours. 29 C.F.R. § 785.1.

"Hours worked" under the FLSA include hours the employee volunteers to work as extra hours, so long as the employer knows or should know of the arrangement. 29 C.F.R. § 785.11. It is management's duty to exercise control and see that overtime work is not performed if management does not want overtime work

to be performed. 29 § C.F.R. 785.15. The employer cannot reap the benefits of an employee's overtime hours without compensating for them. *Id.*

Claims for violations of the FLSA must be brought within two years, except that the statute of limitations is extended to three years for wilful violations. 29 U.S.C. § 255(a). Therefore, unless Rite Aid's behavior is deemed a "willful violation," most of the behavior described in Gonzalez's complaint falls outside the statute of limitations.[5]

■ The standard for evaluating willful behavior is whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," and plaintiff bears the burden of proof on the issue. *Herman v. RSR Security Serv., Ltd.,* 172 F.3d 132, 141 (2d Cir.1999) (quoting *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)); *see also Reich v. Waldbaum,* 52 F.3d 35, 39 (2d Cir.1995).[6]

In *McLaughlin,* the Supreme Court addressed the meaning of willfulness under the FLSA, noting that while "willful" has not been consistently interpreted by the courts, "it is generally understood to refer to conduct that is not merely negligent." 486 U.S. 128, 108 S.Ct. 1677. The Court explicitly rejected a standard that would require "nothing more than that the employer has an awareness of the possible application of the FLSA." *McLaughlin,* 486 U.S. at 130, 108 S.Ct. 1677 (quoting *Coleman v. Jiffy June Farms, Inc.,* 458

---

**5.** Gonzalez commenced this action on December 15, 2000, alleging that he was not paid for overtime worked between August, 1998, and December, 1998. Therefore, if the two year statute of limitations applies, any claims for the period preceding December 15, 1998, would be time-barred.

**6.** Rite Aid does not contest that it is an "employer," which the FLSA defines as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see also Herman v. RSR Sec. Serv., Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999).

F.2d 1139, 1142 (5th Cir.), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972)) (further citation omitted). The Court wrote that the use of a two-tiered statute of limitations "makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." *Id.* at 132, 108 S.Ct. 1677.

### b. *New York State Labor Law*

Gonzalez brings his final claim pursuant to the New York Labor Law. Under the Labor Law, clerical and other workers "shall be paid the wages earned in accordance with the agreed terms of employment, but not less frequently than semimonthly, on regular pay days designated in advance by the employer." N.Y. Lab. § 191(1)(d) (McKinney 2001). Section 198(3) of the Labor Law provides a six-year statute of limitations for wage claims. *Gustafson v. Bell Atlantic Corp.,* 171 F.Supp.2d 311, 322 (S.D.N.Y.2001).

### 2. *Application*

### a. *The Merits*

■ As discussed above, Gonzalez has presented substantial evidence showing that he worked significant amounts of overtime and that Rite Aid was aware of his overtime and failed to pay him. Gonzalez presents the declarations of his supervisors, Bunyan and Maldonado, in which they both state that he worked extensive hours of overtime. Bunyan then chronicles Gonzalez's efforts to be paid for his overtime, which purportedly involved not only Bunyan, but Bunyan's superiors at Rite Aid and Gonzalez's union. Gonzalez also testified, at his deposition, that he worked many hours of overtime during his employment at the Grand Concourse store. Rite Aid attacks the claimed number of overtime hours as exorbitant and unbeliev-

able, but, again, this conflict in the evidence must be resolved at trial.

### b. *Wilfulness*

■ The parties have presented conflicting declarations regarding Rite Aid's knowledge of the purported FLSA violations. As discussed above, Gonzalez presents the declarations of his immediate supervisors, who state that Gonzalez worked substantial amounts of overtime and was not paid for it. In contrast, Rite Aid offers the declarations of Mullin, Krupka, and Mallone. All three state that they were unaware of Gonzalez's payroll problems.

Because the decision regarding the proper statute of limitations rests on disputed questions of fact concerning Rite Aid's state of mind, Rite Aid's motion for summary judgment on the FLSA claim is denied. Rite Aid is a sophisticated business that employs many people who are covered by the wage and hour laws. A reasonable juror could infer that Rite Aid knew its conduct was prohibited by law. Furthermore, a reasonable juror could find that Rite Aid's conduct was willful, and not merely negligent.

### c. *NY Labor Law Claim*

Rite Aid requests dismissal of the state law claim on the assumption that the federal claims are dismissed. That not being the case, this prong of the motion is denied.

### *CONCLUSION*

For the reasons set forth above, Rite Aid's motion for summary judgment is denied. The parties shall appear for a pretrial conference on May 10, 2002, at 12:00 p.m. in Courtroom 11A, Daniel Patrick

Moynihan United States Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.

## ORDER

Rite Aid's motion for reargument is denied for the reasons set forth in the Court's memorandum decision dated April 23, 2002. I add only the following. Lohengryn Gonzalez's heart ailment is a physical impairment within the meaning of the ADA, and the question of whether "extreme physical exercise," "strenuous lifting," and "strenuous activity" are activities that are of "central importance to most people's daily lives" is best decided by a jury at trial. Although there does not appear to be significant disagreement between the parties as to the particulars of plaintiff's medical condition, there is disagreement as to the inferences to be drawn from those facts. Moreover, as I noted, even if plaintiff is not disabled within the meaning of the ADA, he can proceed on the theory that he has been discriminated against because of a perceived disability.

As for the issues raised regarding exchanges between opposing counsel and non-party witnesses, the Court will address these issues at the pre-trial conference scheduled for May 10, 2002.

SO ORDERED.